STEPHEN J. WINDHORST, Judge.
| ^Defendant, Eddy Dominguez, was indicted on one count of second degree murder, a violation of La. R.S. 14:30.1, and one count of simple burglary, a violation of La. R.S. 14:62. After a jury trial, defendant was convicted of the lesser crime of manslaughter on count one. He was found not guilty on count two. Defendant was sentenced to forty years at hard labor without the benefits of probation or suspension of sentence. This appeal followed.
FACTS
On the evening of May 19, 2009, the Gretna Police Department received a call in reference to shots being fired. When they arrived on the scene, a witness said that she had seen two Hispanic males fleeing the area. The victim, Jonathan Flowers, was found on the canal bank. The forensic pathologist who performed the autopsy of Mr. Flowers stated that he died of a gunshot wound that traveled though the left lung, aorta and right lung. The victim also had lacerations to his face that were consistent with being hit in the face by a pistol. The pathologist agreed that the wounds to the victim’s face could have also been caused by punches or kicks. A toxicology screen revealed the presence of *652 marijuana. The victim had bags of marijuana and crack cocaine on his person.
[¿During the afternoon of May 19, 2009, defendant and his cousin, Bryan Rosales, were with Opal and Shelby Lukes at the Lukes’ house, on Claire Avenue in Gretna, Louisiana. Defendant and Rosales frequently spent time with the Lukes sisters. This group smoked marijuana on an almost daily basis. Both defendant and Rosales are Hispanic.
Around 11:00 P.M. that evening, when their supply of marijuana ran out, defendant and Rosales walked to the “Mary Poppins” area, near the house and across a canal, to buy more drugs.[1] After defendant and Rosales crossed over the canal, a stranger, later identified as the victim, approached and told them he had marijuana to sell. The stranger then left, after saying that he was going to talk to his “people.” Rosales got nervous and left the area before the stranger came back.
Later, they were approached by the same individual, who asked them if they had any money. Defendant stayed to talk, and Rosales walked away. Rosales testified that he heard sounds of “wrestling” or “tussling,” and then he heard “some shots.” He then saw defendant and the other man wrestling and he ran back to help defendant by trying to “kick the guy off.” Rosales ran up the canal bank, slipping along the way and becoming covered in mud. Rosales returned to the Lukes’ house. He stated that when he returned to Claire Avenue that night, he told Opal Lukes that a man had tried to rob defendant. Rosales changed his clothes and walked with Shelby Lukes to a nearby “Brothers” store to pick up some food. While walking, they were stopped by police officers who asked them if they had seen anything suspicious in the neighborhood, to which Rosales replied that he had not. After Rosales picked up the food, they returned to the house on Claire, where | ^defendant and Opal were waiting for them. When Rosales first saw defendant, he appeared to be “a little anxious.”
At trial, Rosales testified that he had seen defendant with a gun earlier on the date of the crime. Rosales never saw the victim with a gun, although the victim acted as if he wanted defendant and Rosales to think that he had a gun. However, the victim never pointed a gun at him or at defendant when Rosales was present. Rosales further stated that he heard a total of two or three gunshots. Rosales testified that he and defendant never discussed what had happened that night.
Shelby Lukes testified at trial that earlier on the day of the shooting, defendant showed her a gun and told her that he had stolen it from Lonzell Silas’ car. She further testified that when defendant and Rosales left to get marijuana, defendant said that he wanted to rob someone but she did not take him seriously. Shelby Lukes also testified that when Rosales returned to the house, he stated that defendant had shot someone. When defendant returned to the house, it appeared that he had been running and there was blood on this shirt. She asked him what happened and he stated that someone had tried to rob him. Defendant removed his bloody shirt and threw it in the trash can.
Opal Lukes testified that earlier on that day, she had seen defendant with a gun. She remembered that defendant and Rosales went to buy marijuana in the “Mary Poppins” area across the canal. When defendant and Rosales returned, she saw a *653 drop of blood on defendant’s face. Defendant stated that someone tried to rob him.
Defendant, Rosales, and the Lukes sisters spent the night in a nearby motel. The next morning Shelby Lukes was contacted by the Gretna Police, and then brought to the Homicide Bureau, where she gave a statement to the police. At trial Shelby admitted that on the night of the murder, she was taking Xanax for which |fishe did not have a prescription. At the time of trial, Shelby Lukes was imprisoned for possession of heroin.
Opal Lukes and a friend gave defendant and Rosales a ride “across the river.” When Opal returned, she was stopped by the police and brought to the station. She gave a statement to police at that time.
Rosales testified that when he and defendant left Opal, they were picked up by the police. They were driven to a police station, and separated. Rosales stated that he did not realize why he had been arrested, until Shelby was brought into the room to speak with him. He later realized that the victim must have been shot during his fight with defendant. At trial, Rosales admitted that he agreed to testify as a part of a plea agreement with the state.
DISCUSSION
In his first pro se assignment of error, defendant alleges that the State failed to prove his conviction “beyond a reasonable shadow of a doubt.” He further argues that his conviction was obtained with the use of unreliable evidence. Because this assignment relates to the sufficiency of the evidence presented, we address it before all other assigned errors as per State v. Hearold, 603 So.2d 731, 734 (La.1992).
When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, supra.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found the State proved the essential elements of the crime beyond a reasonable doubt. State v. Price, 00-1883 (La.App. 5 Cir. 7/30/01), 792 So.2d 180, 184. A reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 07-2306 (La.1/21/09), 1 So.3d 417, 418. As a result, under the Jackson standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt *654 beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240.
In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. State v. Caffrey, 08-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, writ denied, 09-1305 (La.2/5/10), 27 So.3d 297. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. See State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Dixon, 07-915 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ denied, 08-0987 (La.1/30/09), 999 So.2d 745.
In this case, defendant was charged with second degree murder but was convicted of the responsive verdict of manslaughter. La. R.S. 14:31 provides for two separate elemental definitions of manslaughter: specific intent manslaughter and felony/misdemeanor manslaughter.[2] Under La. R.S. 14:31 A(2)(a), manslaughter is “a homicide committed, without any intent to cause death or great bodily harm” under circumstances “when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person.”
The testimony presented at trial established that on the day of May 19, 2009, defendant had been seen carrying a weapon by three witnesses: Shelby Lukes, Opal Lukes, and Bryan Rosales. Shelby Lukes further testified that defendant said that he had stolen the gun from Lonzell Silas’ car. Before defendant and Rosales left to purchase drugs that evening, defendant indicated to Shelby Lukes that he wanted to rob somebody. Rosales testified that he and defendant went to purchase marijuana from the area known as “Mary Poppins.” Rosales and defendant crossed the canal to get to Mary Poppins. After they crossed over, a stranger, later identified as the victim, walked up to them and told them that he had marijuana to sell. Rosales and defendant left the area but were approached by the same individual later that night. Rosales testified that he never saw the victim with a fygun, although it appeared that he wanted defendant and Rosales to think that he had a gun. The victim never pointed a gun at him, nor did he see the victim point a gun at defendant. Rosales testified that he had walked away while defendant and the individual fought. Rosales said that he ran back to help defendant by trying to “kick the guy off him.” After Rosales left defendant and the victim, he heard a total of two or three gunshots. He did not recall seeing anyone else on the canal bank that night. Rosales and defendant never discussed what had happened. Thus, Rosales’ testimony established that defendant had been armed previously on the date of the victim’s murder and that defendant fought with the victim immediately prior to the shooting. The shooting took place within the context of a sale of narcotics, and evidence established that narcotics were found in close proximity to the victim’s body.
*655 Testimony by Shelby Lukes established that defendant returned to the house on Claire Avenue with blood on his clothing after attempting to purchase narcotics. When Rosales returned, he said, “Eddy shot him.” When defendant returned to the house, it appeared that he had been running and there was blood on his shirt. Defendant threw his shirt in the trash can. When Shelby Lukes asked defendant what had happened, he said that someone had tried to rob him. Opal Lukes testified that when she first saw defendant after he had returned, he had blood on his face.
There was further testimony that while police were canvassing the area shortly after the shooting occurred, a witness reported seeing a couple of Hispanic males fleeing from the canal bank. The following day, Detective Ashton Gibbs set up undercover surveillance and ultimately found Rosales and defendant, two Hispanic males, who got into a car in a Burger King parking lot. Soon after the car left the Burger King parking lot, one of the Hispanic males lay down in the back|10seat so that he could not be seen while the car was traveling on the roadway. Police followed Rosales and defendant into New Orleans where they exited the car and began to travel on foot. Defendant later tried to escape apprehension when approached for questioning by police.[3]
We find that the State met its burden of offering sufficient evidence to support defendant’s conviction beyond a reasonable doubt for felony/misdemeanor manslaughter under the definition and elements provided by La. R.S. 14:31 A(2)(a).
As a second part to this assignment, defendant asks “Was the conviction in this case obtained with the use of unreliable Testimony?” Defendant attacks the credibility of Bryan Rosales, as well as Opal and Shelby Lukes regarding their testimony in his case. It is not the function of the appellate court to assess credibility or re-weigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442, 443. Nevertheless, defendant’s arguments are without merit.
Defendant attacks the veracity of Shelby Lukes, who was admittedly on drugs the night that the shooting took place. This Court has previously held that when the issue of a witness’ drug use is brought before the jury by a defendant, it is within the jury’s discretion to believe or not believe the evidence presented to discredit that witness. The jury’s conclusion regarding the credibility of the witnesses is dependent upon its in-court observation, and when faced with a conflict in testimony, the jury is free to accept or reject, in whole or in part, the testimony of any witness. State v. Alexander, 12-836 (La.App. 5 Cir. 5/23/13), 119 So.3d 698, writ denied, 13-1981 (La.3/21/14), 135 So.3d 614.
Defendant questions the contradictions between Opal Lukes’ and Shelby Lukes’ testimony regarding the amount of blood on defendant when he returned [^from attempting to purchase drugs. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Bradley, 03-384 (La.App. 5 Cir. 9/16/03), 858 So.2d 80, 84, writs denied, 03-2745 (La.2/13/04), 867 So.2d 688 and 08-1951 (La.1/30/09), 999 So.2d 750.
Finally, defendant challenges the credibility of Bryan Rosales, who admitted on *656 the record to having a plea deal with the State. Again, in this instance, the revelation to the jury that Rosales had entered into a plea bargain in exchange for his testimony does go to his credibility. However, the jury was clearly aware that Rosales agreed to testify against defendant in return for a plea agreement and, apparently finding his testimony to be believable, gave it the credibility they believed it deserved. See State v. Foreman, 08-0902 (La.App. 4 Cir. 4/29/09), 10 So.3d 1238. There is nothing in the record to show that the jury abused its discretion in its assessment of credibility, or made factual findings which were manifestly erroneous.
The evidence presented at trial supports the jury’s verdict. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of manslaughter beyond a reasonable doubt. We find defendant’s first pro se assignment of error to be meritless.
In his first counseled assignment of error, defendant argues that the trial court erred in denying his Batson challenge in light of the State’s pattern of strikes during voir dire. Defendant does not allege a pattern of prejudice against a specific race or suspect class by the State, but claims “a pattern of discrimination against minorities.”
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory | ^challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Batson decision is codified in La.C.Cr.P. art. 795C, which provides that no peremptory challenge made by the State or the defendant shall be based solely upon the race of the juror. State v. Massey, 11-357 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 467, writ denied, 12-0991 (La.9/21/12), 98 So.3d 332. Article 795C further provides that if an objection is made that the State or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Massey, 91 So.3d at 467.
In Batson, the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of prospective jurors were based on race. Massey, 91 So.3d at 467 (citation omitted). Under Batson and its progeny, the defendant challenging the peremptory strike must first establish a prima facie case of purposeful discrimination. Id. 91 So.3d at 467-68. Second, if a prima facie showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Id. 91 So.3d at 468. Third, the trial court then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination. Id.
In the first step, to establish a prima facie case, the defendant must show: (1) the prosecutor’s challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the potential juror because he or she is a member of that cognizable group. Massey, supra. This initial three-prong showing by the defendant gives rise to “the necessary inference of | ^purposeful discrimination” by the prosecutor. “The inference is ‘necessary* because if such an inference cannot be drawn from the evidence presented by the defendant, he is unable to make a *657 prima facie case of purposeful discrimination and his Batson challenge expires at the threshold.” If the trial court determines the defendant failed to establish the threshold requirement of a prima facie case, then the analysis is at an end and the burden never shifts to the prosecutor to articulate neutral reasons. Id.
Considering the first jury panel called, the record is clear that the trial court did not find that defendant had established a prima facie case of purposeful discrimination by the State. With respect to the requirement that the challenges were directed at a cognizable group, the record contains no identification of or reference to the race or ethnicity of the stricken jurors against whose peremptory dismissals the Batson challenges were made by defense counsel.
Assuming, however, that defendant had established that the prosecutor’s challenges were directed at members of a cognizable group, the record definitely reflects that the State’s challenges in question were all peremptory and therefore the second prong was met.
However, considering the third requirement of showing purposeful discrimination, the transcript reveals that when making his Batson challenge defendant failed to specifically identify any jurors or state the cognizable group to which each stricken juror belonged as the basis to his challenge. Nor did he allege how the State was discriminatory, except a general allegation of “a pattern of discrimination against minorities.” Such identification and specificity is necessary so that a juror-by-juror assessment can be made to determine whether the voir dire examination and the stricken juror’s responses support a race neutral basis for exercise of a peremptory challenge, or the existence of purposeful discrimination. | uTo the extent that any review could be made by this court, there was nothing obvious in the record of the voir dire colloquy that might have raised a reasonable inference of exclusion based on race. The State exercised five peremptory challenges. One challenge was against a juror who told the court that a medical condition would make it “absolutely impossible” for him to serve, in addition to medication he was taking that made it difficult for him to pay attention.[4] A second juror stated that he had previously served on at least four criminal juries, including one for a capital case, where the defendant had been found not guilty.[5] A third juror was a social worker, a profession that might make her more sympathetic to the defendant.[6] Thus, the trial court did not err in its conclusion that defendant did not establish a prima facie case of purposeful discrimination as to the jurors in the first panel.
With regard to the second jury panel, the record shows that defendant’s *658 Batson challenge to other jurors was not made until after all jurors and alternates had been chosen and sworn in and those not chosen from the jury panel were discharged. A Batson challenge made at that point in the proceedings is untimely. “In order to preserve the complaint that the prosecutor’s use of a peremptory exception was based on race, the defense must make an objection before the entire jury panel is sworn.” State v. Williams, 524 So.2d 746 (La.1988). The ruling, and thus the prerequisite Batson objection, must be made at a time when the trial court 11fican correct any misuse of peremptory challenges. Id.; See also State v. Lamark, 584 So.2d 686 (La.App. 1st Cir.1991). Although jurisprudence has indicated that Batson objections should at least be made “at some time before the completion of the jury panel,” in order to fulfill the purpose of that principle, a defendant must make a Batson objection contemporaneously with the State’s exercise of the allegedly racially biased peremptory challenges, or at the least, reasonably soon enough thereafter that the stricken jurors have not been dismissed from service. An objection made even before the entire jury panel is sworn and completed is untimely if the prospective jury has been chosen, individually sworn and dispensed to return at a subsequent date, and those against whom the State has allegedly misused its peremptory challenges have been dismissed completely. State v. Aubrey, 609 So.2d 1183 (La.App. 3 Cir.1992).
An objection raised untimely, as in the present case, does not allow the trial court the opportunity to correct any misuse of peremptory challenges. A timely objection would allow a trial court to rule on a Batson objection in time for the trial court to correct the error by reinstating the improperly challenged jurors. State v. Aubrey, supra. Additionally, “[a]n obvious advantage of a prompt ruling on Batson objections is that memories are fresh and a better record can be made of such relevant factors as the race and the demeanor of the jurors, the neutral reasons for challenging the jurors[.]” State v. Williams, supra, at 746 n. 4.
By failing to timely assert his Batson claim, and in the absence of a contemporaneous objection, defendant waived his alleged claims of discrimination. State v. Potter, 591 So.2d 1166 (La.1991). Considering the foregoing, we find no merit to this assignment of error.
In his second counseled assignment of error, defendant contends that the trial court erred in not excusing Juror Kay Evans for cause. Specifically, defendant |1fiargues that Juror Evans “was not qualified to serve in this case” because “she was biased for the State.”
La.C.Cr.P. art. 797 provides grounds upon which a juror may be challenged for cause:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
*659 (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
Louisiana courts have held that a true test of a juror’s qualification to serve is his or her ability to judge impartially based on evidence adduced at trial, as gleaned from totality of responses given at voir dire. State v. Fairley, 25,951 (La.App. 2 Cir. 5/4/94), 645 So.2d 213, writ denied, 94-1940 (La.11/11/94), 645 So.2d 1152, writ denied 94-2909 (La.3/24/95), 651 So.2d 287. The trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the entire voir dire reveals an abuse of discretion. State v. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280.
In this case, the voir dire transcript shows the following pertaining to Juror Kay Evans. Ms. Evans indicated that she was not married, had no children, and worked for the State of Louisiana Department of Children and Family Services. When the State asked Ms. Evans if she could read someone’s mind to determine specific intent, she responded “no” then clarified it was something the State has to prove by using information gathered from other people. When asked what percent | ^constituted a “preponderance” of evidence, she was unsure but responded “A lot.” Ms. Evans indicated that she previously testified as a witness in a trial and that the experience was “nerve-racking.” She had friends and colleagues in law enforcement because of her work at the Department of Children and Family Services. Ms. Evans said that she was an investigator for eight years in the field, and it was one of the reasons she had to testify. She stated that she would be able to weigh a police officer’s testimony the same as any other witness and decide whether or not she believed his testimony. Ms. Evans indicated that she knew Detective Richard Russ as a friend from high school, and from when she was an investigator. It had been two years since she worked with Detective Russ. She stated that she would not automatically vote guilty in a case where Detective Russ testified just because she was familiar with him. She would be able to judge his testimony the same as she would for any other witness. Ms. Evans stated that she did not think it would be awkward if she voted not guilty and “ran into Detective Russ” after the trial. Despite the fact that she had been acquainted with Detective Russ, she thought that she could still be fair and impartial.
Next, when the State asked the panel whether anyone had a close friend or family member “who has been affected by the epidemic of drugs and drug use in this country,” Ms. Evans replied that she had a brother who was murdered in 1990 while purchasing drugs in New Orleans. She said that she did not think the experience made it impossible for her to serve as a juror in the case. Specifically, Ms. Evans indicated that she would not automatically favor the State if drug use or drug dealing were referenced in the case but that she would require proof.
Defense counsel asked Ms. Evans some clarifying questions about her previous answers. She said that her brother was with someone trying to buy marijuana when he was killed, and they tried to drive away without paying for the h «drugs. Counsel then asked if she could be fair if the facts in the instant case mirrored those of what happened to her brother. Ms. Evans replied that it would be difficult but that she did not think that she would be unfair. She confirmed that she had been friends with Detective Russ since high school and that they had previously worked on the *660 same side of a case. Because of their past history and relationship, she believed that Detective Russ was “honest, credible and believable.” Ms. Evans explained, however, that if Detective Russ took the stand and was later contradicted by conflicting testimony, she would “take everything into consideration” and would not automatically believe Detective Russ because of who he is. However, she did admit that she would probably believe Detective Russ over defendant if defendant took the stand and relayed a different version of the events.
Later in the voir dire, Ms. Evans said that she would not have a problem serving on a jury where the allegation is that the crime occurred when the defendant was seventeen years old. She also did not have a problem with the fact that sometimes persons who are just as guilty, or even more guilty than a defendant, will make a plea deal. Ms. Evans did not recall hearing about this crime or the name of the victim in this case.
Defense counsel challenged Ms. Evans for cause, arguing that she had a personal relationship with one of the lead detectives in the case. The State disagreed, asserting that Ms. Evans had indicated she could listen to Detective Russ and decide whether or not she believed he was telling the truth. Defense counsel then argued to the court that Ms. Evans’ answers in voir dire indicated that “There’s no chance of her voting not guilty, Judge, because she just said she thinks this guy [Detective Russ] is — she thinks the world of this guy. So I don’t — I’m not on a level playing field.” Ultimately, Ms. Evans was called to the bench where, l)3out of the hearing of the venire, Ms. Evans was questioned as to whether she would automatically believe Detective Russ instead of other witnesses, to which she replied that she would not, and whether she could be fair and impartial, to which she replied that she would.
After the trial court denied defendant’s challenge for cause, defense counsel used a peremptory challenge to excuse Ms. Evans.
Defense counsel’s challenge for cause of Ms. Evans fell under two arguments: 1) A bias against defendant because of the murder of her brother during a drug deal; and 2) Her prior friendship and working relationship with Detective Russ, which presumably would automatically lead Ms. Evans to And Detective Russ’ testimony more credible.
Defendant asserts that in spite of her answers that she could be fair and impartial in considering the potential testimony of Detective Russ, Ms. Evans’ prior friendship and professional relationship with him should have served as a basis to excuse her for cause. Although personal connections to and relationships with law enforcement personnel do not, by themselves, disqualify prospective jurors for cause, such associations and relationships are subject to careful scrutiny. State v. Alexander, 620 So.2d 1166 (La.1993). The question is whether the prospective juror could assess the credibility of each witness independently of his relationship with law enforcement. State v. Carlos, 618 So.2d 933 (La.App. 1st Cir.1993), writ denied, 623 So.2d 1305 (La.1993). If bias or prejudice may be reasonably attributed to the relationship or association, the juror should be excused for cause. Alexander, supra.
In this case, the entirety of the voir dire transcript on this issue shows that Ms. Evans stated that she would be able to weigh a police officer’s testimony the same as any other witness and decide whether or not she believed his testimony. LoShe stated that she would not automatically vote guilty in a case where Detective Russ testified just because she was famil *661 iar with him. She would be able to judge his testimony the same as she would for any other witness. Despite the fact that she was acquainted with Detective Russ, Ms. Evans thought that she could still be fair and impartial. When questioned by the trial judge, Ms. Evans stated that she would not automatically give one side greater weight and that she could follow the law as directed. We find that, based on Ms. Evans’ responses, she could be fair and impartial with respect to Detective Russ’ testimony.
With respect to her brother’s murder, defense counsel asked Ms. Evans if she could be fair if the facts in the instant case mirrored those of what happened to her brother. Ms. Evans replied that it would be difficult but that she did not think that she would be unfair. Under similar circumstances, the Louisiana Supreme Court has found that a trial court did not err in refusing to strike a juror for cause. See State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). Taking into account the entire voir dire of Ms. Evans’ that she could be fair even if the facts of the case were similar to those of her brother’s murder, we find that the trial court did not abuse its discretion in refusing to excuse Ms. Evans for cause.
In his second pro se assignment of error, defendant argues that his forty-year sentence, which is the maximum sentence for manslaughter, is excessive.
A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case and, therefore, is given broad discretion in sentencing. State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). In considering whether the trial court abused its discretion in sentencing a defendant, a reviewing court should consider the nature of the crime, the nature and j s>T background of the offender, and the sentences imposed for similar crimes by other courts. State v. Horne, 11-204 (La.App. 5 Cir. 2/14/12), 88 So.3d 562, 569, writ denied, 12-0556 (La.6/1/12), 90 So.3d 437.
Here, the record shows that defendant had armed himself earlier in the day and talked about committing a robbery. Defendant later that evening fought with and shot an unarmed man several times, after which he disposed of his clothing and planned on fleeing the state.
At the time of sentencing, the court considered several factors. The court indicated that it was disturbed by the fact that defendant had a firearm prior to the incident and indicated that he wanted to “go rob somebody.” The court surmised that defendant went to the “Mary ■ Poppins” area with the intent to “rip somebody off’ and that is why defendant brought the gun. It appears that defendant drew the victim “away from his comfort zone” and then attacked him. The judge found it significant that while defendant and Rosales said that they were walking away from the victim, defendant wound up behind the victim, which bolstered defendant’s previous statement that he intended to rob someone. The court stated that, based upon the evidence, defendant was guilty of second degree murder. It also took into account La.C.Cr.P. art. 894.1 sentencing guidelines, and enumerated several that it found applicable to the particular case.
Louisiana courts have found that the fact that the evidence might have supported a verdict of second degree murder is an appropriate sentencing consideration, where the defendant has been convicted of the lesser offense of manslaughter. See State v. Roussel, 424 So.2d 226, 231-32 *662 (La.1982), overruled on other grounds by State v. Jackson, 480 So.2d 263, 268 (La.1985); State v. Wooden, 572 So.2d 1156, 1161 (La.App. 1 Cir.1990). Furthermore, the maximum penalty has been upheld by this court in similar circumstances where the | ^defendant was charged with second degree murder and convicted of manslaughter. See State v. Hyman, 09-409 (La.App. 5 Cir. 2/9/10), 33 So.3d 271, writ denied, 10-0548 (La.10/1/10), 45 So.3d 1094; State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07), 958 So.2d 24; State v. Jones, 05-735 (La.App. 5 Cir. 2/27/06), 924 So.2d 1113, 1118-19, writ denied, 07-0151 (La.10/26/07), 966 So.2d 567.
We find that the manslaughter sentence imposed was not excessive and that the trial court did not abuse its discretion in imposing the maximum sentence when considered in light of the crime committed.
Defendant also contends that the trial court erred in denying his motion for reconsideration of sentence. In his motion, defendant had argued that his sentence was excessive under the facts and circumstances of the case. On appeal, defendant argues that his sentence is constitutionally excessive and that the court should have considered a downward departure under State v. Dorthey, 623 So.2d 1276 (La.1993). Since we find that the maximum imposed sentence is not excessive, we also find that, based on the reasons provided by the trial court during sentencing, the trial court did not abuse its discretion in denying defendant’s motion to reconsider sentence. Finally, we note that Dorthey, which allows a court to deviate from a mandatory minimum sentence in certain limited instances, is inapplicable to this case.
In his final argument of his second pro se assignment of error, defendant contends that he received ineffective assistance of trial counsel. Specifically, defendant asserts that counsel should have hired an expert to explore the impact that drug use had on Shelby Lukes’ testimony and to expose “the impossibility of Shelby Lukes testimony.” Defendant also claims that “[c]ounsel should have hired an investigator for this case, the prosecution theory of this case does not ‘Comport’ with Justice and Fundamental Fairness.”
1 gjThe Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution safeguard a defendant’s right to effective assistance of trial counsel. According to the United States Supreme Court’s opinion in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant asserting an ineffective assistance claim must show: 1) that defense counsel’s performance was deficient, and 2) that the deficiency prejudiced the defendant. The defendant has the burden of showing that “there is a reasonable probability that, but for counsel’s unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
Generally, an ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the district court, where a full evidentiary hearing can be conducted, rather than by direct appeal. State v. Taylor, 04-346 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595. When the record contains sufficient evidence to rule on the merits of the claim and the issue is properly raised in an assignment of error on appeal, it may be addressed in the interest of judicial economy. Id. Where the record does not contain sufficient evidence to fully explore a claim of ineffective assistance of counsel, the claim should be relegated to post-conviction proceedings under La-C.Cr.P. arts. 924-930.8. Taylor, *663 supra. In this case, we conclude that the record is sufficient to allow a review of defendant’s ineffective assistance claims on appeal.
With respect to defendant’s first claim pertaining to Shelby Lukes, the record demonstrates that defense counsel thoroughly explored the issue of Lukes’ drug use on cross-examination. Defense counsel established that Lukes was a recovering drug addict. Defense counsel questioned Lukes specifically on how her l^use of drugs may have affected her memory of the night in question and established that she had used Xanax and marijuana. Lukes admitted on cross-examination that because of her use of Xanax on that night she “forgot a lot of things.” The jury also heard Lukes admit on redirect examination that the amount of Xa-nax she was using resulted in her remembering only “bits and pieces” of the events that occurred that night. Because defendant’s trial counsel made the full extent of Lukes’ drug use known to the jury for their consideration, his performance was not deficient under the first prong of Strickland, supra.
Defendant also makes a general claim that “[c]ounsel should have hired an investigator for this case.” However, it is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a specific showing of prejudice. State v. Brogan, 453 So.2d 325 (La.App. 3 Cir.), writ denied, 457 So.2d 1200 (La.1984). Because defendant’s argument here lacks specificity on how he was prejudiced by his defense counsel’s performance, defendant has not met his burden of satisfying the first prong under Strickland, supra.
Finally, to the extent that defendant argues under the heading of ineffectiveness of counsel that “the prosecution theory of this case does not ‘Comport’ with Justice and Fundamental Fairness,” we have found that the evidence presented by the State at trial was sufficient for a conviction. Defendant’s claims of ineffective assistance of counsel are without merit.
ERROR PATENT DISCUSSION
We have reviewed the record for errors patent according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) and find the following which merit attention.
|2fiThe trial court erred in imposing defendant’s sentence with a restriction of benefit of probation or suspension of sentence. Defendant was convicted of manslaughter, a violation of La. R.S. 14:31. The relevant sentencing provision of that statute provides, “Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years.” When a sentencing error involves the imposition of restrictions beyond what the legislature has authorized in the sentencing statute, a court of appeal should correct the sentence on its own authority under La.C.Cr.P. art. 882. State v. Sanders, 04-0017 (La.5/14/04), 876 So.2d 42 (per curiam). Accordingly, we amend the sentence to remove the restriction of benefits. We remand this matter for the district court to make the entries in the commitment reflecting this change and direct the clerk of court to transmit the original of the minute entry to the officer in charge of the institution to which the defendant has been sentenced. See La.C.Cr.P. art. 892B(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam).
Second, although the commitment reflects that defendant was given a proper notice of the time period for seeking post-conviction relief as required by La.C.Cr.P. art. 930.8, the transcript does not. The transcript prevails when there is a discrep *664 ancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).
Accordingly, we advise defendant by way of this opinion that no application for post-conviction relief, including applications which seek an out-of time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922. See State v. Brooks, 12-226 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030.
hr,CONCLUSION
For the above discussed reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED AND REMANDED FOR CORRECTION OF COMMITMENT.

. Bryan Rosales testified that he purchased drugs from the "Poppins” area either every day or every other day from different individuals. He also stated that he had been robbed on previous occasions while attempting to purchase drugs.

. The jury verdict form does not specify under which theory of manslaughter the jury found defendant guilty.

. Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier of fact may infer guilt. State v. Wilkerson, 403 So.2d 652, 659 (La.1981).

. In State v. Tucker, 591 So.2d 1208 (La.App. 2 Cir.1991), writ denied, 594 So.2d 1317 (La.1992), the second circuit found that under similar circumstances a racially neutral reason for a peremptory strike existed.

. In State v. Dabney, 91-2051, 633 So.2d 1369 (La.App. 4 Cir. 3/15/94), writ denied, 94-0974 (La.9/2/94), 643 So.2d 139, the fourth circuit upheld as race-neutral reason using peremptory challenges on jurors based upon how he or she rendered a verdict as a juror in a previous trial.

.In State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006), the Louisiana Supreme Court found that a prosecutor’s concern that a prospective juror's occupation might result in him being more compassionate to a defendant was a sufficient race-neutral reason for a peremptory challenge.